UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Morgan Wright,

        Plaintiff,

v.

The Travelers Home and Marine
Insurance Company,

        Defendant.

Court File: 23-cv-2646 (ECT/TNL)

**AMENDED COMPLAINT**

Morgan Wright (hereinafter, "Plaintiff"), for her Complaint against The Travelers Home and Marine Insurance Company (hereinafter, "Defendant") states and alleges as follows:

**PARTIES**

1. Morgan Wright is, and at all times material herein was, an individual resident of the State of Minnesota in the City of Minneapolis, Hennepin County, Minnesota.

2. Upon information and belief, Defendant is, and at all times material herein was a corporation authorized to sell insurance within the State of Minnesota and has as its registered office and principal place of business at One Tower Square, Hartford, CT 06183.

3. One Tower Square, Hartford, CT 06183 is the address Defendant is required to have on file with the Minnesota Department of Commerce for purposes of accepting service of process under Minnesota law.

## BACKGROUND

4. Plaintiff restates and realleges the previous paragraphs herein and further states and alleges as follows:

5. Upon information and belief, Defendant was in the business of selling homeowners' insurance in Minnesota at all times material herein.

6. Susanna E. Blumenthal was, at all times herein, an employee of Defendant and the "Claim Professional" assigned by Defendant to represent it as its employee and agent on all matters related to claims under the insurance policy herein. At all times relevant herein Blumenthal acted as if she was, and she was in fact, authorized to speak on behalf of the Defendant and to bind the Defendant in all matters related to Plaintiff's claim under the insurance policy herein, including any representation as to the Defendants interpretation of and actions regarding the terms of the Insurance Policy.

7. Ms. Kristi DeMarais at all time relevant to these proceedings has been the investigator for the Minnesota Department of Commerce assigned to Plaintiff's complaint with that Department. A Minnesota Commerce Department complaint against Defendant was brought by the Plaintiff on or about September 28, 2021, that preceded the Complaint herein, alleging misconduct on the part of Ms. Blumenthal and Defendant. Plaintiff was informed by Ms. Demairas that further action under her Department of Commerce complaint would be deferred until after completion of any court proceedings. Ms. DeMarais was copied on all correspondence between Plaintiff and Defendant.

8. The Complaint brought by the Plaintiff with the Department of Commerce is still pending.

## THE INSURANCE POLICY

9. On or about April 19, 2021, Defendant issued a Homeowners Condo Policy to Plaintiff, (hereinafter "The Insurance Policy") for the Policy Period of April 19, 2021

through April 19, 2022. A true and accurate copy of the Insurance Policy is attached hereto and incorporated herewith as **Exhibit A**.

10. In return for insurance under the Insurance Policy, Plaintiff paid Defendant premiums.

11. The Defendant promised to provide insurance coverage during the Policy Period insuring the Plaintiff's home and personal belongings at their replacement cost against direct physical loss or damage.

12. The Insurance Policy was in force on August 8, 2021.

13. The Insurance provides for replacement cost for personal items of up to $ 119,600.00 and casualty losses of up to $137,500.00, and loss of use of up to $68,750.00

14. Plaintiff is a Julliard-trained pianist who relies upon the presence of a very high-quality piano in her home. Her profession requires its daily use and practice. In addition, Plaintiff at all times relevant herein, has and continues to give private piano lessons which has occasioned the daily need for and use of a piano in her residence.

### PLAINTIFF'S KNOWN DISABILITIES

15. Notwithstanding her ability to use the piano for her livelihood, Plaintiff has a full disability as a result of an Astrocytoma, a brain cancer that was removed but that has left her with multiple, permanent disabilities, including a seizure disorder requiring the presence of a service animal, a severely compromised immune system, diagnosed PTSD with attendant panic attacks, major depression and numerous forms of migraine headaches, including hemiplegic and cluster migraines. A number of the daily consequences of her disabilities include sensory sensitivity to sounds, smell and movement which manifest as extreme intolerance of crowds and overstimulation around groups of people. This has resulted in her inability to have more than three other people

in her home and a lifestyle that is very simple, with minimal visual or auditory stimulation in her home apart from her piano music. The relatively few things she does own, however, are high quality, often of great value, and were procured over a period of forty years.

16. At all times relevant to this action, Defendant and/or its agents have had actual knowledge of Plaintiff's disabilities. Indeed, the Plaintiff repeatedly communicated to Ms. Blumenthal orally and in writing of her condition and the difficulties she was experiencing remaining in her home because of its impact on her health prior to the needed repairs being made.

## THE EVENT

17. On or about August 8, 2021, at approximately 3:00 a.m., a water pipe burst in the unit immediately above Plaintiff's, immediately inundating her dwelling with eight inches of water that covered the floor, soaked the ceiling and many of the walls in her unit. It immediately shorted out her refrigerator and soaked all rugs and carpeting, as well as many of her clothes, her bedding, her piano and her furniture. As of the time of the Event, Plaintiff no longer had a functioning kitchen or a working piano.

18. Plaintiff gave timely notice under the terms of the Insurance Policy to Defendant of the Event and her loss.

19. The day following the Event, an emergency mitigation service company was brought in by the Homeowners Association of the building in which Plaintiff's home is located to attempt to mitigate the problem by using, primarily, large commercial fans to ventilate her home. The use of the fans continued for over a week, caused Plaintiff to suffer at least one seizure and daily debilitating migraine headaches. These actions and conditions also caused the absorption of moisture into the woodwork and drywall that had not been directly submerged in the Event. Plaintiff's home experienced very high humidities as a result of the water intrusion for weeks thereafter, resulting in mold and

the warping of woodwork and furniture, and water damage to her carpets, molding, interior walls, and ceilings, in addition to virtually all of her clothing. The ongoing damage and moisture issues in her home caused her continued, debilitating symptoms to go on unabated.

### PLAINTIFF'S DETERIORATING HEALTH AND GOOD FAITH EFFORT TO MITIGATE

20. Plaintiff experienced serious, deteriorating health issues, including a high increase in migraine incidents, difficulties in breathing and repeated seizures in her home as the result of the Event in her home. This also included difficulties in getting to sleep and chronic and severe ongoing fatigue. Prior to the Event, these kinds of symptoms, notwithstanding her disabilities, were rare. These symptoms were caused by the catastrophic damage to her home and her inability to find an alternative place to live while repairs were being made.

21. That Plaintiff communicated her health difficulties related to the humidity and condition of her home after the Event directly to Ms. Blumenthal. Plaintiff specifically requested that she be relocated to another residence while it was repaired. Defendant, through its agent, Ms. Susanna Blumenthal, categorically stated that Defendant would not pay for such an alternative, notwithstanding the provision in the Insurance Contract that allowed for such a relocation. ***Insurance Contract**, Exhibit 1, Coverage D, "Loss of Use" at page 5 of 24.*

22. Plaintiff relied on Ms. Blumenthal's representation that she would not be compensated by Defendant under the policy for any alternative living arrangement that would be necessary as the result of the Event. She did not bring it up in her written statement of claim because she was told by Blumenthal that it was not something that Defendant would pay for in this case.

23. Plaintiff's only income is from disability payments she receives as well as what she can earn from giving piano lessons. Her frugality has allowed her to live in her home and meet her living expenses, but she does not have the means to rent another home while still paying the mortgage and association fees she is required to pay to be in her home.

24. Nevertheless, having been told by Blumenthal that the Defendant would not provide alternative living payments, Plaintiff actively researched nearby, comparable rental units, longer term hotels and residences to see if she, alone, could find a place to live in while her home was repaired. Even after looking into well over a dozen possibilities, she found none she could afford on her own. Moving out of her home while repairs were being made would have made her homeless for that entire period.

25. The refusal by Blumenthal on behalf of Defendant to allow any claim for alternative living expenses forced Plaintiff to remain in her badly damaged home to this day, more than two-and-a-half years later. This fact had a serious and worsening adverse impact on her health causing her to miss work and regularly seek and pay for medical assistance to deal with the symptoms that were being caused by remaining in her home.

### PLAINTIFF'S GOOD FAITH DETERMINATION OF HER DAMAGES

26. As this event occurred in the midst of the Covid pandemic, Plaintiff initially had difficulty in obtaining a fully qualified contractor to bid on the repair and replacement of her damaged home and its fixtures. Plaintiff was ultimately able to do so and the Contractor established that restoration of her premises would cost $199, 315.66.

27. Plaintiff informed Defendant that her piano had been irreparably damaged and would need to be replaced. Blumenthal and Defendant responded by bringing in a purported "expert", who knew next to nothing about pianos and was only interested in repairing the wooden furniture case of the piano. He had next to no knowledge of the

inner workings of pianos. This caused extreme anger and stress on the part of Plaintiff, which was a deliberate tactic by Blumenthal to take advantage of Plaintiff's disability to exact a settlement. Blumenthal stated to Plaintiff: "what would you know about this? You've had a brain tumor." Only after six months did the Defendant agree to pay for another piano. During the period between when the Event damaged the piano beyond repair and when a replacement piano was purchased for Plaintiff, she was without her principal means of employment.

28. The delay in receiving a replacement piano caused Plaintiff damage due to her lost income and was entirely the fault of Defendant and its agent.

29. Once Blumenthal finally acknowledged that the piano was a total loss, Plaintiff diligently looked for a comparable replacement. Plaintiff found such a piano in Nebraska, which was an older model available at substantially less than other comparable pianos in the immediate area. The total amount paid for the cost of the replacement, its shipment and installation, was $ 90, 870.63.

30. Defendant refused to pay for a destroyed leather couch which Plaintiff then replaced with a couch costing $ 8, 582.34. This refusal was consistent with Blumenthal's ongoing harassment of Plaintiff, which included many other such refusals to replace the Plaintiff's personal property destroyed by the Event.

31. In another example of Blumenthal's' abusive and discriminatory behavior, Plaintiff's refrigerator, which shorted-out from the water intrusion, was not repaired for 18 months after the Event. During that time, Plaintiff did not have a functioning kitchen, could not store any food requiring refrigeration for more than 24 hours. She relied on a used, old "dorm cube" to keep small quantities of milk and perishables for brief periods.

32. Apart from the foregoing, no replacements for destroyed personal items were paid for by Defendant.

33. That Defendant's principal agent, Susanna Blumenthal, was personally threatening and abusive in her communications with Plaintiff in a manner in which was clearly intended to be intimidating and taking advantage of the Plaintiff's disabilities.

34. Blumenthal made faces and disrespectful gestures at the Plaintiff when she was in Plaintiff's home. Blumenthal smilingly mimicked Plaintiff's tremors and uncontrolled movements (which were caused by Plaintiff's disabilities) in Plaintiff's presence with the purpose of causing upset and intimidating Plaintiff. Although she had been told both orally and in writing to no longer be present in Plaintiff's home, Blumenthal nevertheless went there on more than one occasion and continued to engage in immature and disrespectful conduct directed at Plaintiff.

35. Because of Blumenthal's mocking and disrespectful conduct concerning Plaintiff's disability, Plaintiff asked for the appointment of a different representative. Defendant to do so.

36. Despite being repeatedly told of Plaintiff's disabilities, which included great difficulty in being around any large groups of people, Blumenthal insisted upon and brought numerous people into Plaintiff's home. This continued even after she was specifically told orally and in writing not to do so. Blumenthal refused to accommodate in any way the considerable difficulties experienced by Plaintiff because of her disabilities in having large groups of strangers in her home.

37. Ignoring Plaintiff's express directives to Blumenthal about the needs caused by Plaintiff' disabilities were a consistent pattern of Blumenthal's behavior to use Plaintiff's disability as a weakness and means to intimidate Plaintiff into a settlement.

38. Another example of the pattern of Ms. Blumenthal's behavior was her deliberate and knowing use of two different design plans for completely different units than the one owned by Plaintiff. In each case, an incorrect plan was attached to a plainly

inadequate settlement offer that was for an entirely different condominium unit than Plaintiff's home. Ultimately, Plaintiff paid a third-party business to draft correct plans to use in pursuing her claim. Blumenthal's purported settlement offer based on those erroneous plans did not change. Blumenthal's disregard of Plaintiff's complaint about the wrong plans serving as the basis of the Defendant's settlement offer was the result of her refusal to address any concerns raised by Plaintiff because Plaintiff had a brain disability.

39. On information and belief, Blumenthal's abrasive, insulting and otherwise improper behavior was both a tactic and a strategy to use Plaintiff's disability as a weakness to exact a "cheap" settlement. Obtaining low settlements enhanced her standing with her employer and advanced her personal career, which was Blumenthal's principal motivation in her dealings with Plaintiff.

40. Blumenthal's intentionally aggressive and offensive tactics delayed the settlement of Plaintiff's claim and directly caused additional Plaintiff's disability-based physical symptoms and damages. Plaintiff has had to spend considerable amounts of money, to be determined at trial, in order to treat the PTSD symptoms that resulted from the event, as well as additional treatments she required for her ongoing disability symptoms.

41. Blumenthal's actions prompted Plaintiff to file a complaint with the Minnesota Department of Commerce, which regulates insurance companies and their agents in the State of Minnesota and has direct jurisdiction over the manner in which claims are handled by insurance companies after a claim has been made.

42. The Department of Commerce Complaint, which is dated and filed on September 28, 2021, is directly related to the manner in which Blumenthal failed to respond to Plaintiff's claim and Blumenthal's inappropriate behavior and tactics in the face of Plaintiff's known disabilities. In her initial complaint to the Minnesota Department of Commerce, Plaintiff, in part, stated:

> "I am a professional pianist. My piano was American made with indigenous woods to withstand the temperature and humidity extremes....I have had and continue to deal with many health issues, including a brain tumor in 1984, which makes living under these circumstances extremely difficult. Travelers knows this and they remain unresponsive. I have had daily migraines since August 8. I have been told that the Agent has been on vacation two of the last seven weeks. Yesterday was Agent's first day back. I'd left messages. She called me at 4:30 pm ----- when I returned her call at 4:32 pm, no answer. This has happened many times. I have holes in my walls and my property remains damp. I can hear my neighbors. The only remediation has been fans for the first five days. Meanwhile, I believe I am living in mold and Travelers most recent communication was three weeks ago."

43. In a subsequent, follow-up communication to the Department of Commerce, dated December 1, 2021, Plaintiff wrote:

> "The response filed on behalf of Travelers....reflects a pervasive pattern of deceit, misinformation, and half-truths which has been .....Travelers modus operandi from day one..... Here are a few very significant facts which are omitted entirely from Travelers response: I am disabled and have a service dog. I had a brain tumor in 1984 and have certain deficits over which I have no control. Chief among these are 1) I cannot sort sounds out when multiple people are talking or there is a sound intrusion; 2) I cannot read things on a computer screen---everything must be printed out; 3) I am sensitive to sounds, smells and being overwhelmed by too much sensory input as this may cause a seizure or migraine; 4) I have a compromised immune system and, during a pandemic especially, I cannot have multiple unmasked persons in my property; and 5) I am specifically sensitive to mold and other toxins because of my disability. Ms. Blumenthal either refuses to acknowledge these conditions or is incapable of understanding their impact. I see nowhere in the response by Travelers that these facts are even mentioned."

44. The Plaintiff's Complaint with the Minnesota Department of Commerce was assigned to a senior investigator, Ms. Kristi DeMarais. As noted above, the issue of Plaintiff's disabilities and medical condition were expressly made part of the Complaint to the Department of Commerce, as were generally the Defendant's failures in responding to the issues presented by Plaintiff's disability in addressing her claim.

45. Defendant was at all times relevant herein fully aware of Plaintiff's disabilities in both this action and the matter before the Minnesota Department of Commerce.

46. Ms. DeMarais informed Plaintiff and Defendant that the Department of Commerce would retain jurisdiction of that Complaint but would not proceed further pending resolution of this litigation.

47. That Ms. Blumenthal's inappropriate and discriminatory conduct continued unabated up to and including the date of the Complaint herein. At no time did her misconduct cease.

## COUNT I
## VIOLATION OF MINNESOTA HUMAN RIGHTS ACT

48. Plaintiff restates and realleges the previous paragraphs here and further states and alleges as follows:

49. Defendant is a corporation doing business in the State of Minnesota.

50. Defendant is subject to the provisions of the laws of the State of Minnesota, including what is known as the Minnesota Human Rights Act. Minnesota Statute §363A.

51. §363A.17 of the Minnesota Human Rights Act expressly prohibits "business discrimination" which is defined as a "unfair discriminatory practice….in the performance of a contract because of a person's ….disability, unless the alleged refusal or discrimination is because of a legitimate business purpose".

52. Plaintiff and Defendant are parties to the Insurance Contract, noted above

53. That this action arose when the Event, noted herein, occurred, that resulted in a claim being properly made against the Insurance Policy by the Plaintiff to repair her damaged home and receive damages for her damaged personal property.

54. Defendant, at all times relevant herein, had actual knowledge of the Plaintiff's serious, physical, permanent disabilities.

55. Defendant, at all times relevant herein, had knowledge that the damage to the Plaintiff's home had caused an extensive increase in the number and intensity of Plaintiff's disability-related symptoms.

56. Plaintiff had plainly and very specifically communicated to Defendant through its agent that her disability imposed limitations on her abilities to communicate with Blumenthal on matters related to her claim.

57. Defendant and Blumenthal, its agent, disregarded Plaintiff's express communications regarding her disabilities and the problems they imposed on the claim resolution process.

58. Plaintiff's disabilities required her to be out of her home while repairs were conducted that required the presence of strangers or noise. Plaintiff's chosen contractor also told her it would be necessary for her to be out of the house when the repairs were being made.

59. The Insurance Policy expressly provided for the payment of living expenses outside of the home while repairs were being made on the insured home.

60. Plaintiff did not have sufficient financial resources to live elsewhere while repairs are being made on her home caused by the Event without payment by the Defendant for such expenses under the Insurance Contract.

61. That Defendant, through its agent, Susanna Blumenthal, expressly stated to Plaintiff that Plaintiff would not be entitled to or allowed to claim alternative living expenses under the Insurance Policy. Blumenthal gave no explanation for that position.

62. Defendant is bound by the statement of Blumenthal as to the meaning and interpretation of the Insurance Policy.

63. Plaintiff relied on the express statement of Blumenthal that no alternative living expenses would be given to Plaintiff under the contract and did not separately make that part of her written claim and the direct consequence of that reliance.

64. Blumenthal mocked Plaintiff to her face, mimicking Plaintiff's uncontrolled movements caused by her disabilities. Blumenthal further disparaged Plaintiff on several occasions, stating or suggesting falsely that Plaintiff was unable to understand what was going on because she had experienced the brain damage that was at the core of her disabilities. All of these occurrences were examples of discrimination under the statute.

65. Blumenthal's deliberate discriminatory conduct and comments deeply upset and offended Plaintiff who reasonably believed it all to be an effort to bully her into a settlement by making her disability a weakness in her interactions with Defendant.

66. That as a direct and proximate result of Defendant's actions, Plaintiff has suffered severe mental anguish and suffering.

67. Blumenthal's and Defendant's conduct, noted above, constitute an unfair discriminatory practice in the performance of a contract because of Plaintiff's disability, within the meaning of Minnesota Statute §363A.17 (3).

68. The Plaintiff is entitled to receive and award of at least $50,000, in compensatory damages as will be proven at trial, as well as up to three times the amount proven of the damages sustained as allowed pursuant to Minnesota Statutes §363A.29, subdivision 4.

69. The Plaintiff is entitled to recover damages for mental anguish and suffering under Minnesota Statutes §363A.29, subdivision 4.

70. The Plaintiff is entitled to recover her reasonable attorneys fees, pursuant to the provisions of Minnesota Statutes §363A.29, subdivision 4.

71. That the ongoing Complaint filed with the Minnesota Department of Commerce and its continued investigation of these same claims, and the fact that Defendant's discriminatory behavior continued right up to the time of the commencement of this action tolled any statute of limitation provisions under Minnesota law during the entire period of the claim process and related litigation herein. *See*: Abel v. Abbott Northwestern Hospital, et al., 947 N.W.2d 58 (Minn. 2020), 19-0461, July 29, 2020)

## COUNT II
## VIOLATION OF MINNEAPOLIS HUMAN RIGHTS ORDINANCE

72. Plaintiff restates and realleges the previous paragraphs here and further states and alleges as follows:

73. Defendant is a corporation doing business in the State of Minnesota and the City of Minneapolis, Minnesota.

74. That the matters complained of herein all occurred within the boundaries of the City of Minneapolis, Minnesota.

75. Defendant is subject to the provisions of the Minneapolis Code of Ordinances.

76. Title 7 – CIVIL RIGHTS- of the Minneapolis Code of Ordinances, §139.40, expressly prohibits "Discrimination in Business" which is defined as a "unlawful discriminatory practice" in the provision of a service in the performance of a contract because of or where a person's disability is a motivating factor."

77. That this action arose when the Event, noted herein, occurred, that resulted in a claim being properly made against the Insurance Policy by the Plaintiff to repair her damaged home and receive damages for her damaged personal property.

78. Defendant, at all times relevant herein, had actual knowledge of the Plaintiff's serious, physical, permanent disabilities.

79. Defendant, at all times relevant herein, had knowledge that the damage to the Plaintiff's home had caused an extensive increase in the number and intensity of Plaintiff's disability-related symptoms.

80. Plaintiff had plainly and very specifically communicated to Defendant through its agent that her disability imposed limitations on her abilities to communicate with Blumenthal on matters related to her claim

81. Defendant and Blumenthal, its agent, disregarded Plaintiff's express communications regarding her disabilities and the problems they imposed on the claim resolution process.

82. Plaintiff's disabilities required her to be out of her home while repairs were conducted that required the presence of strangers or noise.

83. The Insurance Policy expressly provided for the payment of living expenses outside of the home while repairs were being made on the insured home.

84. Plaintiff did not have sufficient financial resources to live elsewhere while repairs are being made on her home caused by the Event without payment by the Defendant for such expenses under the Insurance Contract.

85. That Defendant, through its agent, Susanna Blumenthal, expressly stated to Plaintiff that Plaintiff would not be entitled to or allowed to claim alternative living expenses under the Insurance Policy. Blumenthal gave no explanation for that position.

86. Defendant is bound by the statement of Blumenthal as to the meaning and interpretation of the Insurance Policy.

87. Plaintiff relied on the express statement of Blumenthal that no alternative living expenses would be given to Plaintiff under the contract and did not separately make that part of her written claim and the direct consequence of that reliance.

88. Blumenthal mocked Plaintiff to her face, mimicking Plaintiff's uncontrolled movements caused by her disabilities. Blumenthal further disparaged Plaintiff on several occasions, stating or suggesting falsely that Plaintiff was unable to understand what was going on because she had experienced the brain damage that was at the core of her disabilities. All of these occurrences were examples of discrimination under the statute.

89. Blumenthal's deliberate discriminatory conduct and comments deeply upset and offended Plaintiff, who reasonably believed it all to be an effort to bully her into a settlement by making her disability a weakness in her interactions with Defendant.

90. That as a direct and proximate result of Defendant's actions, has suffered severe mental anguish and suffering.

91. Blumenthal's and Defendant's conduct, noted above, constitute an unfair discriminatory practice in the performance of a contract because of Plaintiff's disability, within the meaning of Title 7 – CIVIL RIGHTS- of the Minneapolis Code of Ordinances.

92. Plaintiff has suffered consequential damages as the direct result of Defendant's discriminatory actions in excess of $50,000, in a specific amount to be proven at trial.

93. That the ongoing Complaint filed with the Minnesota Department of Commerce related to these same claims and Blumenthal's ongoing discriminatory conduct tolled any statute of limitation provisions under Minnesota law during the entire period of the litigation herein

**WHEREFORE**, Plaintiff seeks judgment against Defendant from this Court as follows:

1. For an Order and Judgment against Defendant under the Minnesota Human Rights Act for consequential damages suffered by Plaintiff in excess of $50,000 as proven at trial, and an additional award of three times that amount as authorized by Minnesota Statutes 363A.29, subd. 4.

2. For a Finding of mental anguish and suffering of Plaintiff by Defendant's actions and an Order and Judgment for damages against Defendant for mental anguish and suffering as provided under the Minnesota Human Rights Act in an amount to be proven at trial.

3. For an award of punitive damages of $25,000 as allowed under Minnesota Statutes 363A.29, subd. 4.

4. For an award of Plaintiff's reasonable attorney's fees as allowed in Minnesota Statutes 363A.29, subd. 4.

5. For an Order and Judgment against Defendant under Title 7 of the Minneapolis Code of Ordinances Act for damages suffered by Plaintiff in excess of $50,000 as proven at trial.

6. For such other relief, including costs and, if allowed, attorneys fees, as the Court may determine to be right, just and correct under the circumstances herein.

Dated: February 23, 2024          BY: _____

Frederic W. Knaak (Mn.Lic#0056777)
Holstad & Knaak PLC
**North Star Law Group**
*Attorneys for Plaintiff Wright*
413 Wacouta, Suite 550
St. Paul, MN 55101
(651) 330-9678
fknaak@klaw.us, fritz@northstarlaw.com